IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2020

## COTY SHANE SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Monroe County
No. 16-167    Sandra Donaghy, Judge**

---

### No. E2019-00963-CCA-R3-PC

---

The petitioner, Coty Shane Smith, appeals the denial of his petition for post-conviction relief, which petition challenged his guilty-pleaded conviction of second degree murder, alleging that he was deprived of the effective assistance of counsel.  Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Donald Winder, III, Athens, Tennessee, for the appellant, Coty Shane Smith.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Monroe County Grand Jury charged the petitioner with felony murder and conspiracy to commit aggravated robbery, arising from the March 2012 robbery and murder of Luther "Luke" Vineyard.  *State v. Coty Shane Smith*, No. E2014-00490-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Knoxville, Dec. 26, 2014).  Co-defendants Lorenz Freeman, Joshua Steele, and Jessica Payne were also charged for their participation in the offenses.  *Id.*  Pursuant to a plea agreement, the petitioner pleaded guilty to the lesser included offense of second degree murder, and the State dismissed the remaining charge.  *Id.*, slip op. at 2.  The facts as recited at the plea submission hearing are as follows:

> [O]n March the 4th, 2012, that Mr. Freeman, [the petitioner,]
> and Ms. Payne had an attempt to go and rob the victim in this

case, a Mr. Vineyard. That they went to his place of residence, that the female, Ms. Payne, stayed in the vehicle and the two gentlemen get out. That they approached his residence when another vehicle shows up and they get spooked and leave and so there's no event that happens at that point. They go to a residence where they get hold of Mr. Steele. At that point, sometime later on, and Ms. Payne does not return with them, but Mr. Freeman, [the petitioner], and Mr. Steele go back to Mr. Vineyard's residence, and at that point they go in [wearing masks] and it is Mr. Freeman and Mr. Steele who are the ones that hold on to the victim Mr. Vineyard and he's hit in the head with a piece of iron, a piece of wrought iron, and eventually dies—

> . . . .

[The petitioner] was involved in the planning, [the petitioner] goes through the house, the house is ransacked looking for what we expect they were looking for cash, there were some rumors going around that the victim . . . had a large amount of cash that was there. After this happens they leave, go back, and there's some other conversations that goes on. Fortunately law enforcement gets on top of this thing fairly quickly and does a[n] outstanding job of investigating the case and statements are taken from Mr. Freeman and Mr. Steele, and Ms. Payne that would support the facts that I've outlined to the court.

*Id.*, slip op. at 2 (first, fourth, fifth, and ninth alterations in original) (footnote omitted). Prior to his sentencing hearing, the petitioner, through counsel, moved to withdraw his guilty plea. *Id.*, slip op. at 3. Trial counsel promptly moved to withdraw from representation, asserting that he had a conflict of interests. *Id.* The trial court denied counsel's motion to withdraw, and after a hearing, the court also denied the petitioner's motion to withdraw his guilty plea. *Id.* The trial court imposed a sentence of 25-years' incarceration.

In April 2016, the petitioner filed a timely pro se petition for post-conviction relief, and, after the appointment of counsel, he filed an amended petition. After two substitutions of counsel, the petitioner filed a second amended petition, alleging, among other things, numerous instances of deficient performance by trial counsel.

At the December 2019 evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner in June 2012. After receiving discovery materials from the State, counsel met with the petitioner at the jail to review the evidence. Included in the discovery materials were video recordings of the petitioner's and co-defendants' incriminating interviews with law enforcement officers. Trial counsel acknowledged that the petitioner could not view those materials because no computer was available at the jail and because he did not bring a laptop with him. He also did not make copies of the video recordings for the petitioner to keep and attempt to view later. Counsel met with the petitioner at the jail several other times but made no effort to bring a laptop on his subsequent visits. Counsel stated, however, that the petitioner "was aware of the contents" of the recordings because they included the petitioner's own statement and because he was provided with summaries of the interviews.

In coordination with the other defense attorneys, trial counsel moved to suppress the incriminating statements by the petitioner and the co-defendants, which motion was denied. He moved for interlocutory appeal on the matter. Prior to the resolution of the interlocutory appeal, the State presented a plea offer, a condition of which was that the petitioner "waive any appellate rights."

Trial counsel described his trial preparation as consisting of "dealing with the evidence that the State was going to introduce against" the petitioner. He considered hiring an investigator for the case, but ultimately decided against it, although he could not remember why. Counsel was aware of Detective Brannon's past conduct that could be used for impeachment but said that Detective Brannon's interactions with the petitioner "were somewhat tangential" because the petitioner's interviews were conducted by Tennessee Bureau of Investigation ("TBI") agents. Counsel could not recall whether the petitioner had named any potential witnesses that he wanted counsel to interview, but in January 2013, the petitioner mentioned that he was at Walmart at the time of the offense, and counsel made a note to himself to look into the matter. Counsel acknowledged that he did not attempt to obtain any video footage from Walmart, explaining that, in his experience, "Walmart does not keep video for more than . . . [90] days." He also noted that the petitioner did not mention this alibi in his statement to the police. Counsel did not seek an independent autopsy because "the wounds to . . . the victim's head were pretty self[-]explanatory." He also did not seek independent analysis of a shoe print found at the crime scene because the TBI's analysis of the print was inconclusive as to the petitioner.

Trial counsel acknowledged that the discovery materials indicated that the victim's neighbor had identified someone who had previously threatened the victim but that he did not investigate that allegation. He also acknowledged that Dennis Talent had told the police that Daniel Bookout had said that he could receive a life sentence for what

happened to the victim, but counsel did not investigate that allegation because "there were no details in this statement" that indicated that Mr. Talent or Mr. Bookout had helpful information, noting that the statement indicated that the victim was killed with a gun, but no gun was actually involved in the offense. Counsel acknowledged that Starla Cooper had told the police that "she knew that . . . the victim . . . was going to be robbed," but counsel did not seek to interview Ms. Cooper because she "wasn't very specific, who was going to rob him or anything like that" and because it was "common knowledge" that the victim "sold pills out of his home, and was reputed to keep large amounts of cash in his home."

Trial counsel received the plea offer from the State in early June and relayed the information to the petitioner on June 11. He explained to the petitioner the terms of the offer and his sentencing exposure if he should be convicted at trial. Counsel recalled that the petitioner had difficulty understanding the concept of felony murder, asking "how he could be guilty of murder if he was not the one who inflicted the . . . injuries" to the victim. Counsel stated that he was confident that the petitioner understood the proceedings and the implications of a guilty plea, but the petitioner continued to question how he could be convicted for murder. The petitioner did not immediately accept the plea offer and requested his discovery materials. Counsel met with the petitioner on June 19 at the jail and gave the petitioner all discovery materials, although the petitioner still did not have the ability to view the video recordings. Counsel also gave the petitioner a letter that memorialized the discussion that they had on June 11. Before counsel met with the petitioner, he learned that all the other co-defendants were accepting plea offers. Counsel explained to the petitioner that the co-defendants would likely testify against him if he went to trial and advised him to accept the plea offer because he was otherwise facing a life sentence. Counsel also explained to the petitioner that accepting the plea offer would require that he give up certain rights, including his right to the interlocutory appeal that was pending. At that time, the petitioner decided to accept the plea offer.

After the petitioner pleaded guilty but two or three weeks prior to his scheduled sentencing hearing, the petitioner told trial counsel that he wished to withdraw his guilty plea because he could not "in good conscience go to prison for something that somebody else . . . [had] done," because he did not understand what he was doing when he entered his plea, and because counsel had failed to advise him of the implications of his plea. Counsel moved to withdraw the plea at the petitioner's request, and he also moved to withdraw as counsel, believing that he had a conflict of interests because the petitioner intended to present a claim that counsel's representation was deficient at the plea stage of the proceedings. The State had also indicated that it would call trial counsel as a witness in a hearing on the plea withdrawal motion. Before moving to withdraw from representation, counsel contacted the Board of Professional Responsibility about the matter

and followed their advice to withdraw as counsel. The trial court denied counsel's motion to withdraw, ordering him to continue representing the petitioner during the plea withdrawal hearing. At that point, counsel requested a continuance of the hearing, noting that, because of the conflict of interests, he had not prepared the petitioner to testify. The trial court denied the motion, and the hearing proceeded that day.

At the hearing on the motion to withdraw the plea, the petitioner did not express any displeasure with counsel's representation, and the trial court denied the motion. Counsel then met with the petitioner to prepare for the sentencing hearing, discussing what witnesses, if any, the petitioner wished to call and his appeal options after sentencing. The petitioner decided that he did not want to call any witnesses. Counsel discussed appealing the length of the sentence with the petitioner, but he did not provide the petitioner with a draft of the appellate brief because he "was running out of time" to file it. Counsel stated that he did not raise the denial of the motion to withdraw as counsel on appeal because the petitioner had not alleged any deficiency in counsel's representation at the motion hearing. He also did not appeal the denial of the motion to withdraw the plea because he did not believe there was any basis on which to do so.

During cross-examination, trial counsel testified that because of the petitioner's statement to the police, in which he detailed the offense, counsel believed that it would be difficult to argue an alibi defense, particularly since the petitioner did not raise his alibi in his interviews with law enforcement. Additionally, each co-defendant and another witness placed the petitioner at the scene. If the petitioner had gone to trial, counsel believed that the State's case "would have been very strong" and that the co-defendants would testify that the robbery was the petitioner's idea. Counsel stated that the TBI had investigated Mr. Talent's statement and had summarized their findings in a report, concluding that Mr. Bookout had not implicated himself in the offenses. The TBI had also investigated other potential suspects. Counsel stated that he was less concerned with the vague statements of witnesses about other potential suspects than he was about the defendant's incriminating statements. Counsel questioned Detective Brannon and Ms. Cooper at the suppression hearing.

Trial counsel stated that he prepared for the plea withdrawal hearing by researching the legal standard to prevail on such a motion and by explaining to the petitioner that he would question him about his satisfaction with counsel's representation. Counsel told the petitioner that he should "say what you have to say, that you think fairly represents what you think is the truth" regarding his representation. In the motion hearing, the petitioner did not make any allegation of deficient representation by counsel and instead indicated that he entered his plea under duress and pressure from the significant sentencing exposure he faced if convicted at trial. Based on the petitioner's testimony, counsel

believed he had no legal grounds on which to appeal the denial of the motion. On appeal of the petitioner's sentence, counsel challenged the trial court's application of enhancement factors and the length of the sentence. Counsel was aware that the petitioner attempted to file a pro se notice of appeal, raising additional issues, but counsel stated that the petitioner asserted evidence that was not in the record and could not have served as the basis of an appeal.

The petitioner testified that he had asked trial counsel to investigate "[a]libi issues, location issues, [and] text message issues," asserting that security footage from Walmart would have shown that he was at the store at the time of the offenses. He asserted that text messages between him and co-defendant Freeman would show that co-defendant Steele had returned to the crime scene after the robbery. The petitioner stated that counsel failed to do any investigation other than review the discovery materials despite the petitioner's telling him of other potential suspects and potentially exonerating statements by witnesses. The petitioner said that he wanted counsel to seek additional analysis of the footprint found at the scene to potentially prove that it belonged to someone else. He also said that counsel failed to tell him that he could request funds to hire an investigator or expert witness to aid in the defense. He asserted that counsel was focused on the potential felony murder conviction rather than "actually investigating the facts of the case" and developing a theory of defense for trial.

The petitioner said that he was unable to view certain electronic discovery materials prior to entering his plea because, although he asked counsel to bring a computer to the jail, counsel never did so. The petitioner stated that upon review of those materials sometime later, he discovered numerous issues that would have caused him to reject the plea offer and go to trial. The petitioner said that, during his plea submission hearing, he "didn't understand anything to do with the actual court" and that he did not know at that time that trial counsel had not done what he should have in his representation. The petitioner consented to counsel's moving to withdraw prior to the plea withdrawal hearing because he believed that counsel had a conflict of interests. He stated that counsel was not prepared for the hearing and had not provided him with the questions that counsel intended to ask or the standards the petitioner had to meet to succeed on the motion.

The petitioner stated that he had asked counsel to call his grandmother and great uncle as witnesses at the sentencing hearing, and although both were present at the hearing, counsel failed to call them and did not explain why. Counsel wrote the petitioner a letter, stating that it was not worthwhile to pursue an appeal of the denial of his motion to withdraw as counsel or the motion to withdraw the guilty plea, but he did not explain why he would not pursue those issues. Counsel did not meet with the petitioner after the sentencing hearing to prepare the appeal, and the petitioner stated that he was not given an

opportunity to participate in his appeal. The petitioner pursued a pro se appeal because counsel "told me he wasn't gonna file an appeal." He did not receive a copy of the appellate brief until after it was filed. The petitioner contended that counsel's conflict of interests persisted through the appeals process, and, accordingly, counsel did not provide adequate representation.

During cross-examination, the petitioner acknowledged that he told the police that he planned the robbery, kicked in the victim's door, and saw co-defendant Steele hit the victim with a lead pipe, but he stated that little physical evidence tied him to the scene. He was aware that counsel sought to have his incriminating statements suppressed. The petitioner recalled that, at his plea withdrawal hearing, he testified that he "had a change of heart" about his plea and should not have been convicted of second degree murder because he did not take part in the victim's death. He acknowledged that the fear and duress that he claimed caused him to plead guilty stemmed from the sentencing exposure he faced if convicted at trial.

TBI Special Agent Josh Melton interviewed the petitioner three days after the victim's death but had "technical difficulties" during the interview, causing him to record only a portion of the petitioner's statements. After the technical issues were resolved, he asked the petitioner to repeat the portions of his statement that had not been recorded, and the petitioner asserted his right to counsel at that time, "and the conversation only lasted a period of time after that." Special Agent Melton said that during the interview, the petitioner implicated himself in the attempted robbery and, although he identified co-defendant Steele as having been the one to strike the victim, he indicated that "he was there and did participate in the acts . . . that caused [the victim's] death." At no point did the petitioner indicate that he had an alibi or that co-defendant Steele had returned to the victim's house after the robbery.

At the close of the evidence, the post-conviction court accredited trial counsel's testimony over that of the petitioner and made findings of fact on the record. The court found that counsel failed to facilitate the petitioner's review of the electronic discovery materials but that counsel had provided the petitioner with the TBI summary reports of the recorded interviews and that the petitioner "had the benefit of all the information." The court also found that although counsel did not investigate the alleged statements of potential witnesses, he had the report of the TBI's investigation of Mr. Bookout's statements, and counsel questioned Ms. Cooper at the suppression hearing. Additionally, the court found that counsel investigated Detective Brannon's potentially impeachable conduct and questioned him at the suppression hearing. The court found that the petitioner did not notify counsel of his potential alibi until six or seven months into the case and that counsel did not seek the Walmart video footage because it was his experience

that Walmart did not preserve the recordings beyond three months. The court concluded that counsel's decisions to not pursue the alleged text messages or additional analysis of the shoe print were strategic because the petitioner had already made incriminating statements, placing himself at the scene, and an inconsistent statement in the texts could have been used against the petitioner at trial.

In its written order denying relief, the post-conviction court concluded that the petitioner failed to establish that counsel's failure to appeal the denials of the motion to withdraw as counsel and the motion to withdraw the guilty plea and continuing representation despite a conflict of interests constituted deficient performance. The court determined, at any rate, that the petitioner failed to establish that he was prejudiced by counsel's performance. As to the claim that counsel failed to sufficiently investigate the case, the court concluded that because the petitioner failed to present what evidence counsel could have discovered with additional investigation at the post-conviction hearing, he could not prevail on that claim. Additionally, the court concluded that counsel's decision to forgo the use of an investigator or expert witness was a reasonable, tactical decision. Although the court found that trial counsel's failure to facilitate the petitioner's viewing of the electronic discovery materials constituted deficient performance, the court concluded that the petitioner failed to establish that he was prejudiced by counsel's actions.

In this timely appeal, the petitioner reasserts that he was deprived of the effective assistance of counsel by trial counsel's failing to independently investigate the case, failing to facilitate his review of electronic discovery materials, continuing in representation despite an ongoing conflict of interests, and failing to properly appeal all of the issues.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts

clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to carry his burden to prove by clear and convincing evidence sufficient facts to support his claim that trial counsel's representation was deficient. First, the petitioner failed to show what evidence trial counsel could have discovered if he had conducted further investigation in the case. Although the petitioner contends that additional investigation by counsel could have established his alibi or revealed beneficial witnesses, the petitioner failed to present this undiscovered evidence at the post-conviction hearing. Generally, a petitioner fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.") Consequently, this claim lacks merit.

As to the issue of counsel's failing to facilitate the petitioner's review of electronic discovery materials, we agree with the post-conviction court that the petitioner failed to show that he was prejudiced by counsel's actions. Trial counsel's accredited testimony established that the petitioner was aware of the contents of the materials, and one of the recordings was of the petitioner's own statement. The petitioner did not put on any proof as to what information these recordings contained that he did not already know that would have caused him to reject the plea offer, and, accordingly, failed to establish that he was prejudiced in this matter.

Next, as to the petitioner's claim that trial counsel performed deficiently by continuing to represent him despite an ongoing conflict of interests, counsel's accredited testimony established that counsel sought to withdraw from the case because he anticipated a conflict of interests, but the trial court denied his motion. Additionally, the petitioner's testimony at the hearing on his motion to withdraw his plea revealed that no conflict of interests actually existed because the petitioner was not attacking the validity of his plea on any alleged deficiency of counsel. Because counsel did, indeed, attempt to withdraw from representation, the petitioner cannot show that counsel performed deficiently on this issue.

Finally, trial counsel's accredited testimony established that he did not appeal the denial of the motion to withdraw as counsel because the petitioner did not allege any deficiency of counsel at the plea withdrawal hearing. Similarly, he did not appeal the denial of the motion to withdraw the petitioner's plea because he did not find any legal basis on which to do so. Additionally, the petitioner has failed to show how he could have achieved a different outcome on appeal had counsel showed him a draft of the appellate brief before filing it. Consequently, the petitioner has failed to establish that he was deprived of the effective assistance of counsel on appeal.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-10-